## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Mark A. Waldvogel, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant for information associated with Facebook account "Joshua Brereton (Joshy)", Facebook user ID: 100010800187385, that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc. ("Meta"), a company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Meta to disclose to the government records and other information in its possession pertaining to the subscriber or customer associated with the account.

2. I am a Special Agent with the Federal Bureau of Investigation (FBI), and have been since May, 1998. I am currently assigned to the Detroit Division, working in the Kalamazoo Resident Agency. As a Special Agent with the FBI, I investigate violations of Federal Law including Title 18, United States Code, section 248, Freedom of Access to Clinic Entrances Act. I have received training and conducted numerous investigations relating to the use of the internet and social media platforms.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.  Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code, section 248, Freedom of Access to Clinic Entrances Act, as well as arson, pursuant to Title 18, United States Code, Section 844, have been committed by Joshua BRERETON. There is also probable cause to search the account described in Attachment A for evidence of these crimes, as described in Attachment B.

## **PROBABLE CAUSE**

5.  The United States, including the FBI, the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), and its state and local partners, are conducting a criminal investigation of Joshua BRERETON regarding possible violations of 18 U.S.C. § 248(a)(3), intentionally damaging or attempting to damage a facility that provides reproductive health services, a violation of the Freedom of Access to Clinical Entrances Act, and 18 U.S.C. § 844(f)(1), arson of an institution or organization receiving federal financial assistance.

6.  On or about July 31, 2022, at approximately 4:12 p.m., the Kalamazoo Department of Public Safety (KDPS) responded to a structure fire at the Kalamazoo Planned Parenthood (Planned Parenthood), a clinical facility that receives federal funding and provides reproductive health services to include medical, surgical, counseling, and/or referral services relating to the human reproductive system. Planned Parenthood is located at 4201 West Michigan Avenue, Kalamazoo, Michigan 49006. The structure, which was solely occupied by Planned Parenthood, is described as a single-story brick and concrete building surrounded by an approximately six-foot tall fence on all sides with a secured gate at the front of the property.

7.  When officers arrived, they noticed an active fire involving the roof and other exterior areas of the building. They also noticed the exterior dry pendant sprinkler head that was

on the covered entryway on the south side of the building had been activated due to fire spread. This sprinkler head contained the fire growth in the area of the entryway, but the fire was able to grow in the southwest corner of the building that was not protected by a fire suppression system. Using firefighting equipment, KDPS officers extinguished the bushes and soffit that were on fire on the exterior of the building.

8.  Once the fire had been extinguished, KDPS Fire Marshal Scott Brooks conducted a scene assessment and noted two separate points of origin for the fire. The first was in the bushes located in the south and southwest corner of the building. The second source of the fire appeared to be from a fire starter log that appeared thrown onto the roof of the building. This information indicated the fire had been started on the exterior of the building, causing damage to the building, and working toward the interior of the building before it had been extinguished.

9.  During a review of building surveillance system footage, Fire Marshal Brooks surmised the suspect breached the exterior fence, utilized a combustible fuel to ignite the exterior bushes of the building, and then attempted to light a fireplace stater log and throw the burning log onto the roof of the building before fleeing the scene.

10. On August 1, 2022, an FBI Task Force Officer (FBI TFO) reviewed video surveillance from Planned Parenthood from the date of the fire (July 31, 2022) and noted a male subject approach from the west side of the Planned Parenthood building on foot. The male subject was wearing dark colored pants, dark shoes, dark gloves, a camouflage jacket, blue surgical mask, and a black baseball cap. The subject carried a jug in his right hand and a dark backpack in his left hand.

11. During a review of on-scene evidence, investigators recovered a portion of the fire starter log that the suspect appeared to have thrown onto the roof. Investigators examined

3

the log. The wrapping material identified the log as being "Duraflame" Brand. Investigators then checked local stores that sold "Duraflame" fire logs. As part of those checks, ATF Special Agents contacted a Wal-Mart asset protection employee at the Kalamazoo Wal-Mart. A Wal-Mart database check determined a Duraflame fire log had been sold on July 31, 2022, at approximately 2:57 p.m., from the Paw Paw Wal-Mart, located at 1013 South Kalamazoo St., Paw Paw, Michigan 49079. The fire at Planned Parenthood was first reported to law enforcement on July 31, 2022, at approximately 4:12 p.m.

12. ATF Special Agents then contacted an asset protection employee from the Paw Paw Wal-Mart. A check of previous sales revealed that, on July 31, 2022, a male subject, later identified as BRERETON, made two separate purchases, and paid in US Currency. Wal-Mart provided investigators with the receipts as well as video surveillance footage of both purchases. In the first purchase, BRERETON bought citronella torch fuel, a 2.5-pound Duraflame log, and a utility lighter, as well as various household items such as kitchen sponges and cupcakes. An FBI TFO noted the fuel container purchased in the first transaction appeared similar to the jug carried by the subject on the surveillance footage. The second transaction included a black men's hat, which the FBI TFO noted as being similar to the hat worn by the subject in the Planned Parenthood surveillance footage. During both purchases, which occurred within minutes of each other, BRERETON was wearing dark pants and appeared to match the description of the individual seen in surveillance footage outside of the Planned Parenthood later that same afternoon. BRERETON was not wearing a mask or hat during the timeframe that he was inside the Wal-Mart.

13. BRERETON left the Paw Paw Walmart in a lighter colored sedan. The vehicle was parked too far away to get any additional descriptors other than being able to see that

4

it is a lighter colored sedan. However, as explained below, investigators subsequently linked BRERETON to a beige or champagne colored Chevrolet Malibu sedan.

14. In the Wal-Mart video, BRERETON was wearing a short sleeve black t-shirt and appears to have a thin mustache, dark cargo style pants, and grayish tan hiking style boots. In the video, it was clear that BRERETON had a distinct tattoo on his left inner forearm that is a picture of a crown with two cursive words under the crown.

15. On August 2, 2022, the ATF released to the news media pictures from the surveillance video showing the subject in this case and requesting assistance from the public in identifying him.

16. On August 3, 2022, the Kalamazoo Silent Observer tip line received an anonymous tip based upon the news release with the subject's photographs. The tipster identified the subject in the press release as Joshua BRERETON who lived in Paw Paw, Michigan and described BRERETON as being approximately 5'8" tall, weighing 200 pounds, with black hair, brown eyes, in his 20's, with access to weapons.

17. Using the provided tipster information, the FBI TFO conducted a social media check and located a Facebook account for an individual with vanity name "Joshua Brereton (Joshy)." There are numerous open source photographs of BRERETON on this Facebook page. Comparing the photographs of BRERETON on his Facebook page to the surveillance footage of the subject purchasing the items at Wal-Mart, it appears to be the same person. Finally, the Facebook page has links to YouTube videos that BRERETON posted. During a review of this open-source social media content, the FBI TFO matched a forearm tattoo of a crown with letters under it to that of the person in the Wal-Mart register surveillance footage.

18. On August 3, 2022, a KDPS Intelligence Analyst reviewed YouTube videos from BRERETON that appeared relevant to this case. The link to the video is https://www.youtube.com/watch?v=YW9oAQ4FHnw – entitled "The Line Between Good and Evil." On July 3, 2022, Brereton posted this video on his YouTube channel "Courageous Conduct: Civilian Self-Defense." The video is approximately 9 minutes and 13 seconds.

19. Approximately 32 seconds into the video BRERETON says "… We have this plague in American society that we want to put the responsibility on someone else. 'Oh someone else will take care of that person.' Oh, especially the government. The real plague is we think, oh we can all just pay higher taxes to a government and they'll take care of everything. And that's just not going to work well…"

20. At 1 minute, 43 seconds into the video, BRERETON says "… Like right now, we have a genocide happening. Genocide! Of babies! And people think this is always a hot topic. You literally have neighbors who think it's okay to kill a baby. And I won't get too much into it other than read a science book. It's not a religious debate. It's not a political debate. Scientific law says that the fetus is a brand new human being. And we're killing that person. Or some people are killing those people. And so we have conflicts of interest. We have government okays for the killing of peoples…"

21. At 5 minutes, 5 seconds into the video, BRERETON says "… We think someone else is going to do it. Nobody else is going to do it. If somebody else was going to do it – they would have. All right. If somebody was really going to – it would have already been done…"

22. At 8 minutes, 37 seconds into the video, BRERETON says "… So step out of your comfort zone. Lend a hand. Change society from the inside out. Don't put it on someone else and let it trickle down. It doesn't trickle down…"

23.     Further review of open-source information on the Facebook account with account handle "Joshua Brereton (Joshy)" led investigators to posts expressing pro-life views and depicted the individual owner of the account to be someone who matched BRERETON. Open source records indicate such postings on BRERETON's Facebook timeline beginning on or about July 21, 2022. Investigators were unable to retrieve older data without the requested warrant. Based on my training and experience, however, I know that individuals who post items expressing political views on social media like Facebook do so over the course of many months and even years. I also know that users of Facebook frequently use the platform to engage with other individuals who share the same political views and do so over the course of months or even years.

24.     On August 3, 2022, investigators queried BRERETON in a Michigan Secretary of State (SOS) database. SOS records indicate that BRERETON resides in Paw Paw, MI. SOS records also describe BRERETON as 5'10, 230lbs with brown hair. The SOS image of BRERETON also shows the same person that was depicted in surveillance footage from Walmart and the same person in the Facebook pictures and YouTube videos.

25.     An SOS query of vehicles registered to Brereton indicates that he owns a 2014 Chevrolet Malibu sedan. The address on the vehicle's registration is BRERETON's address in Paw Paw, MI.  Also on August 3, 2022, investigators conducted surveillance outside BRERETON's residence in Paw Paw.  As part of that surveillance, early in the afternoon, investigators observed BRERETON arrive driving a beige or champagne colored Chevrolet Malibu bearing a Michigan license plate that comes back registered to BRERETON at his address in Paw Paw.

26. On August 3, 2022, KDPS and ATF arrested BRERETON as he exited his residence located at 600 West Michigan Avenue Apt. 10, Paw Paw, Michigan 49079.

27. On that same date, KDPS, ATF, and the FBI sought and obtained a federal search warrant for BRERETON's residence in Paw Paw. *See* Case No. 1:22-mj-00334. Investigators executed the search warrant the same day. During the search of the premises, investigators recovered a camouflage jacket that matched that of the one observed in the surveillance footage at the Planned Parenthood during the arson from a child's crib in a bedroom. In the same bedroom, investigators also located a social security card issued to Joshua BRERETON.

28. In the living room, investigators found a pair of boots matching the boots observed in the Wal-Mart check out register surveillance footage. Lastly, on a clothes rack in a bedroom of the residence, investigators recovered a black hat which appeared to match the hat worn at the arson scene and purchased at the Paw Paw Wal-Mart. Investigators also located household items, such as sponges and a package of cupcakes, that matched those purchased by BRERETON in the Wal-Mart surveillance footage.

## BACKGROUND CONCERNING FACEBOOK[1]

29. Meta owns and operates Facebook, a free-access social networking website that can be accessed at http://www.facebook.com. Facebook users can use their accounts to share

---

[1] The information in this section is based on information published by Meta on its Facebook website, including, but not limited to, the following webpages: "Privacy Policy," available at https://www.facebook.com/privacy/policy; "Terms of Service," available at https://www.facebook.com/legal/terms; "Help Center," available at https://www.facebook.com/help; and "Information for Law Enforcement Authorities," available at https://www.facebook.com/safety/groups/law/guidelines/.

8

communications, news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

30. Meta asks Facebook users to provide basic contact and personal identifying information either during the registration process or thereafter. This information may include the user's full name, birth date, gender, e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Each Facebook user is assigned a user identification number and can choose a username.

31. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

32. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

33.     Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

34.     Facebook users can upload photos and videos to be posted on their Wall, included in chats, or for other purposes. Users can "tag" other users in a photo or video, and can be tagged by others. When a user is tagged in a photo or video, he or she generally receives a notification of the tag and a link to see the photo or video.

35.     Facebook users can use Facebook Messenger to communicate with other users via text, voice, video. Meta retains instant messages and certain other shared Messenger content unless deleted by the user, and also retains transactional records related to voice and video chats. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.

36.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

37.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as

webpages or content on third-party (*i.e.*, non-Facebook) websites.  Facebook users can also become "fans" of particular Facebook pages.

38. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

39. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present.  The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend.  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

40. Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

41. In addition to the applications described above, Meta provides users with access to thousands of other applications ("apps") on the Facebook platform.  When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

42. Meta also retains records of which IP addresses were used by an account to log into or out of Facebook, as well as IP address used to take certain actions on the platform.  For example, when a user uploads a photo, the user's IP address is retained by Meta along with a timestamp.

43. Meta retains location information associated with Facebook users under some circumstances, such as if a user enables "Location History," "checks-in" to an event, or tags a post with a location.

44. Social networking providers like Meta typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

45. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Meta, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Meta logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of

the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, location information retained by Meta may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

46. Therefore, the servers of Meta are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

47. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Meta to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

48. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) &

(c)(1)(A). Specifically, the Court for the Western District of Michigan is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

49.     Based on the foregoing, I request that the Court issue the proposed search warrant.

50.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.  The government will execute this warrant by serving it on Meta.  Because the warrant will be served on Meta, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.